Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 282, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Transit Mix Concrete Corp., Colonial Sand & Stone Corporation, Ryan Redi-Mix Co., M. F. Hickey Company, Principe-Danna, Inc., Respondents.

Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 282, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.

Nos. 64-C-851, 64-C-852.

United States District Court
E. D. New York.

Dec. 10, 1964.

Carl G. Coben, New York City, for petitioner.

Cohen & Weiss, New York City, for respondent, Local 282, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Bruce H. Simon, New York City, of counsel.

Jacob I. Goodstein, New York City, for respondents, Colonial Sand & Stone Corp., Ryan Redi-Mix Co. & Transit Mix Concrete Corp., Fred H. Krones, New York City, of counsel.

Kimmell & Kimmell, Mineola, N. Y., for charging party, George Negri, Inc., Leonard S. Kimmell, Mineola, N. Y., of counsel.

Harry H. Rains, Mineola, N. Y., for charging parties, Walter Michalowski and Joseph Iocca, Bertrand B. Pogrebin, Mineola, N. Y., of counsel.

ROSLING, District Judge.

In each of the proceedings, captioned as above, the Regional Director of the Second Region of the National Labor Relations Board (hereinafter "Director" and "NLRB" or "Board") applies to this Court by Order to Show Cause supported by petition for an order restraining the respondents from certain activities, charged as unfair labor practices, pending the final disposition of proceedings concerning these matters now before the Board.[1]

In the one instance the respondents designated are Local 282, International Brotherhood of Teamsters, etc. (Local 282), and certain companies engaged in the manufacture and sale of concrete, asphalt and related products in the State of New York (collectively "Concrete Companies", and severally for convenience referred to as "Transit", "Colonial", "Ryan", "Hickey" and "Danna").

In the other, Local 282 is the sole respondent.

The issues involved in the two proceedings and the evidence bearing upon these issues were so closely interrelated that the application has been heard by the Court in a joint trial of both proceedings, and although the determinations herein made and directions given are addressed to each in its status as an independent cause, the facts and applicable law are presented in the following in a single exposition.

In the proceeding in which the Local alone and the Concrete Companies are the respondents the charging party is George Negri, Inc. (Negri) which brings its charges against the Local alone under Section 8(b) (4) (i) (ii) (A) and (B) of the Act, and against both Local and the Concrete Companies under 8(e).[2]

In the companion proceeding the charging parties are Walter Michalowski

1. Pursuant to § 10(l) of the National Labor Relations Act, as amended, ("Act") (61 Stat. 149; 73 Stat. 544; 29 U.S.C. § 160(l)).

2. Section 8(e) of the Act (29 U.S.C. § 158(e)), added by the 1959 Landrum-Griffin Amendments 73 Stat. 519, 543-544 of the Taft-Hartley Act, provides in pertinent part:

"(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transport-

ing or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: * * *."

Section 8(b) (4) of the Act (29 U.S.C. § 158(b) (4) (i) (ii) (A) and (B)) by similar amendment now reads, relevantly, that it shall be an unfair labor practice for a union:

"(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an

and Joseph Iocca, truckdrivers, who each owned at the relevant period a single truck ("owner-operators"). These filed their charges against the local under the same provisions of the Act.

The charges need not be detailed, for they have served their purpose in giving the Board a necessary jurisdiction to issue a complaint into which the charges are merged.[3]

The allegations of the complaint in turn are embodied in those which comprise the petition before this Court. These may be summarized as follows:

### As to the Local jointly with the Concrete Companies (Negri's charges).

Negri, a New York Corporation with place of business in Rego Park, Queens, is a supplier of concrete and related products to building and construction sites. It had during the relevant period no plant or yard for the manufacture of concrete, filling inventory needs for resale to its own customers by purchases from the Concrete Companies. The chauffeur employees of these last were members of, or represented by the Local.

About July 1, 1963, the Local entered into a three year contract[4] with the remaining respondents and others, which contained the following provision:

"Section 12—Company Equipment

\* \* \* \* \* \*

"In the event the employer hires additional equipment, preference shall be given to such equipment as is operated by Union men. Additional equipment may be hired only if all the Employer's own equipment of the same type which is available for use is being operated by the employees of the Employer."

About May 8, 1964 the Local notified respondent companies and these others that they were evading the terms of the provision just quoted. The Local has, in the view of the petitioner, thereby in violation of the provisions of the Act earlier cited entered into contracts under which the "employers cease or refrain or agree to cease or refrain from doing business with Negri and other persons."

Additionally, at about the time mentioned, the Local entered into and thereafter maintained in force an agreement with these other contracting parties "whereby [they] have ceased and refrained, and have agreed to cease or refrain, from doing business with Negri and other persons who do not have plants or yards for the manufacture of concrete. Threats of ensuing work stoppages were made by the Local if such contract employers failed of obedience to the stipulated boycott. Specific instances of such threats addressed to Hickey, Ryan and Danna were cited.[5] The threats to Danna were in the presence of its employees, serving thereby as basis for a charge of inducing and encouraging the employees to strike or to refuse "in the

industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(A) forcing or requiring any employer \* \* \* to enter into any agreement which is prohibited by subsection (e) of this section [or]

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, proc-

essor, or manufacturer, or to cease doing business with any other person \* \* \* *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike \* \* \*."

3. National Labor Relations Board v. Fant Milling Co., 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959); Douds v. International Longshoremen's Assn., 241 F.2d 278 (2d Cir. 1957).

4. Entitled "Ready-Mix Concrete, Sand, Gravel and Asphalt 1963–1966 Contract" (Ready-Mix contract).

5. Hickey and Ryan were threatened on or about June 12; Danna and other employers about June 15, 1964.

course of their employment to use, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities, or to perform services."

Further, petitioner avers, "[s]ince on or about June 12, 1964, respondent Concrete Companies have ceased doing business with Negri and other persons who do not have plants or yards for the manufacture of concrete."

As to the Local alone (Charges of Michalowski and Iocca).

The petition alleges that Michalowski and Iocca are "individuals who own and operate one or more trucks which customarily are used to perform trucking services for persons engaged in the manufacture and sale of concrete, asphalt and other building materials." Lizza & Sons, Inc. (Lizza), a corporation located in Selden, New York, is engaged in the manufacture and sale of apshalt. Its chauffeurs, operators of Euclid and Turnapull equipment, were members of, or represented by, the Local. Michalowski and Iocca had regularly performed trucking services for Lizza.[6] They were owner-operators, and had no employer's contract with the Local.

The petition further alleges that on or about July 1, 1963, Lizza and other persons (employers) entered into the Ready-Mix contract with the Local of which Section 12 has been quoted above. About the same time the Local entered into a second contract styled "Excavating Contract 1963–1966", with Lizza, Parisi (M. Parisi & Son of Maspeth, Queens, an excavating firm) and other persons (employers), which contained the following provision:

"Section 6

\* \* \* \* \* \*

"(c) For the purpose of providing maximum employment for his own employees working under this contract, the Employer shall not hire outside trucks or equipment unless all his usable trucks and equipment are in use. Thereafter outside trucks and equipment shall be hired only from employers who have signed contracts with Local 282 containing identical terms and conditions with this contract, so long as such trucks and equipment are available. 'Trucks and equipment' shall include the following: trucks, tractors, trailers, euclids, turnapulls, and other equipment within the jurisdiction of Local 282."

About April 1964 the Local threatened to strike Parisi and other persons who had been performing work at the New York World's Fair site if they continued to use trucks, the owners of which did not have contracts with the Local.

On or about May 7, 1964, a representative of the Local called upon Lizza and in the presence of its employees announced that if Lizza used owner-operators who were not under contract with the Local— (Michalowski and Iocca were non-contract owner-operators and had from time to time performed trucking services for Lizza)—they would be sent out of Lizza's yard.

Such conduct on the part of the Local —(so the petitioner maintains)—violates the relevant provisions of the Act earlier cited heren, in that said "respondent has [thereby] entered into contracts \* \* \* whereby such employers cease or refrain or agree to cease or refrain from doing business with Michalowski and Iocca and other persons," and has "induced and encouraged individuals employed by Lizza and other persons \* \* to engage in a strike or a refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on \* \* \* materials \* \* \* or to perform services, and has threatened, coerced and restrained Lizza, Parisi, and other persons engaged in commerce or in an industry affecting commerce."

In both petitions it is alleged that an object of said actions was to compel the

---

6. The direct driver-employees of Lizza, it will later appear, operated Lizza equipment, owning none of their own.

employers affected to cease doing business with the charging parties.

Both petitions, moreover, conclude with a prayer for broad injunctive relief pending the Board's determination of the issues of unfair labor practice.

■ Evidence adduced by petitioner upon the hearing largely sustains the factual assertions tendered by petitioner. Notwithstanding some omissions of detail from the overall proof and a haziness of recollection of incident by several witnesses, placed on the stand by the Board and recognized by the Court as hostile, the charges are found by the Court to have been established with a sufficient pertinence and prima facie force to demonstrate that the sections proposed by petitioner as violated have indeed been infringed.

The respondents called no witnesses to testify in their behalf. In summary the proof adduced tends to establish the following:

On or about July 1, 1963 the Local had entered into the Ready-Mix contract with Lizza, the Concrete Companies and others, and the Excavating contract with Lizza, Parisi and others. The contracts contained the clauses quoted in the petitions.

In April 1964 Parisi was engaged in excavating and other work at the World's Fair with Local 282 members driving trucks under his contract with the Local. Requiring additional drivers and equipment for his job, Parisi hired owner-operators, engaging truck and driver as a unit with compensation unapportioned and computed at an hourly rate. The trucker paid his own Social Security, withheld his own income tax and bore the expense of fuel, repairs and maintenance.

On April 19, 1964 a Local delegate (Baia) appeared at the Parisi job site and after some checking and inquiry informed Parisi that if it continued to hire trucks whose owners did not have a contract with the Local, the union trucks would leave the job because they would not work with those who did not have a contract with Local 282.

On April 21 following, the Local met with its contract employers at the Hotel Commodore. O'Rourke, president of the Local, acted as chairman. Other representatives of the Local were in attendance. O'Rourke declared from the rostrum that there was unrest among his membership and "that the situation might get out of hand", evidenced by spontaneous work stoppages, if the employers failed to accede to the demand that they "confine their batching (loading and transporting their material) to their own equipment and not load these owner-driver gypsy fellows."

It is a fair inference from the sequel, although the testimony as to what was said at the meeting is not wholly clear, that an understanding was reached that the Concrete Companies and others similarly active were not to load the "trucks of people who do not have plants" (for the manufacture of material) and that the ban was to extend to Negri. Negri, though he had no plant, owned twelve trucks representing a substantial capital investment. His drivers were all members of the Local with which he had had a contract for many years.

The meeting was then adjourned to May 28, apparently to have a wider attendance of employers. In the meantime a business agent of the Local visited Lizza's premises and informed its superintendent in the presence of the union's shop steward that after the conclusion of that day's work Lizza was no longer to use hired owner-operator trucks, as these lacked a contract with the union, under penalty of having them sent out of the Lizza yard. Michalowski and Iocca, who had theretofore been engaged with their trucks by Lizza, now found themselves denied employment as owner-operators by that firm.

■ A letter under date of May 8 on the letterhead of the Local addressed "To All Employers" over the facsimile signature of O'Rourke in the Local's behalf appears at this juncture to have been

circulated among the employers of drivers, members of the Local in the "Ready-Mix Concrete" industry.[7] The missive spoke in terms of destruction of jobs by "peddlers", of "abusive practices", and of the membership "tak[ing] matters in their own hands." It noted that "some employers are evading the terms of their collective bargaining agreements by having Ready-Mix Concrete delivered by other means than by their employees" and "call[ed] upon each and every employer to have all Ready-Mix Concrete it sells delivered by its own employees under the collective bargaining agreement, and not to allow its products to be delivered through peddlers or engage in other delivery schemes."

Finally with a disclaimer of an intent to threaten, the letter minatorily concluded that "[i]f this problem is not solved within two weeks, we shall not be responsible for any wildcat stoppage that may occur * * * [O]ur members are in such a state of unrest concerning their jobs that the union will be powerless to control them any longer."

On May 28 the second meeting of the Local's representatives with employers was held, this time at the Hotel New Yorker. It was more largely attended by officers of employers, among whom all the respondents were represented, than had been the April 21 meeting. Again O'Rourke occupied the chair and in his remarks to those assembled instructed the employers that "[w]hatever goes through your plant should be delivered by your truck," that the industry confronted an emergency and a "risk and threat of wildcat action," and that "[i]f this thing is not cleaned up in a couple of weeks something serious can be expected to take place in the industry." In summation O'Rourke instructed that "[a]fter June 15 he wanted the suppliers to stop loading outside people * * * owner-drivers, gypsies; people without plants."

After an indefinite but brief interval following the meeting the O'Rourke circular of May 8 was distributed with an addendum printed on the reverse side. It was dated May 28 and had for its only heading the slogan "Employers Destroy Labor Standards" and in lieu of signature a subscription in bold face type rallying the membership to action with a concluding exhortation to "[w]atch for strike day."

The body of the announcement dealt with a number of alleged grievances against employers, not here relevant. Significant and pertinent, however, was the following:

"Do you know that Colonial Sand & Stone, Transit Mix, Hickey, Certified Preferred to mention but a few, have closed some of their plants! The Employers are forced to close their plants while the work is going out the back door. For instance it has been known that a certain employer hires over one hundred owner-operators daily. Another hires one hundred sixty-five. Yet they report a very small portion of this to the Pension and Welfare Plan."

Within a few days the policy of boycott thus enunciated was being put into effect by union representatives. Negri was barred from loading its trucks by Colonial and Transit, Negri's employee being informed that the suppliers could not load Negri or "any other gypsy that did not have a plant." Such refusal was accompanied by advice to Negri that the Local's "shop stewards were going to pull their men out" and that the whole

---

7. Some question was raised at the hearing by union counsel with respect to the purported source of this notice, as well as the status and authority of members of the Local who reportedly issued pronunciamentos to the employers concerned. Apart from the circumstantial context in which these were uttered and their consonance with officially disclosed union policy, and the inferential implementation thereof by the pressures and pleas described in the foregoing, the union's failure to place on the stand as witnesses its president brought into play the evidentiary rule of the missing witness. See II Wigmore on Evidence §§ 285–289. The rule is too well known to require fuller citation of text or case. The Court's admonition to counsel for the Local in this regard was, however, ignored.

industry would have a strike if Transit continued to load Negri trucks. A subsequent attempt by Negri to obtain materials from other sources in the contracted industry met with a like refusal.

### Problem Confronting the Local

The Local is confronted with a genuine labor problem recognized as traditionally a subject for collective bargaining and of such dimension that a failure to solve it may well destroy those standards which long years of arduous labor-management negotiations have painfully achieved.

The owner-operator, or to give him his pejorative appellation, the gypsy trucker, rents himself and his equipment for a lump sum, which provides for the owner-driver after satisfying the inexorable demands of the machine for its maintenance and operation a compensation significantly less than the union standard. When, as is occasionally the case, the driver is one other than the owner, the owner being an employer without a union contract,[8] the driver, even if he is a member of the Local, as is often the case, will be paid less than union scale by the single-truck owner. Moreover, no contributions are made in such employment relationship by the employer to Union Welfare and Union Pension funds in behalf of the driver, whether the owner himself drives or his single employee does.[9]

The erosive effect on wages and hours bargained for by the union and the temptation to contract-employers to divert or subcontract the trucking operation to noncontract owner-operators at lump sums that mask a below union scale compensation for the driver is at once apparent. In the periodic negotiating of labor-management contracts it is a source of strength for the employers, but concomitantly a discouraging element for labor's representatives, to know that in the background of the bargaining there exists a large and growing unorganized mass of "independent contractors" prepared in a competition with the Local's membership for the available jobs to offer their services to the employers at a scale substantially below even that currently in force.[10]

8. The evidence shows that the union will not award a contract to owner-operators.

9. These contributions currently are in respect of the Excavating and the Ready-Mix contracts, 33¢ per hour or $2.64 a day to the Pension Fund and 18½¢ per hour or $1.48 to the Welfare Fund. It is seen, therefore, that the sums required to be contributed are substantial and their nonpayment gains for the owner-operator a significant competitive advantage in bidding for available trucking work in the contract industry.

10. In its supplemental memorandum petitioner writes:
"Respondent Local 282 argues that it is proper to condition the subcontracting of work upon union approval of the subcontractor because if the contracting out is so conditioned, an employer would contract out work only for reasons of efficiency and not in order to undermine the employment standards and work opportunity of the employees covered by the labor contract. This argument has been raised repeatedly to justify secondary boycotts directed against persons whom a union considered objectionable and rejected both in the Congress and the Courts."

Citing a number of cases to support the thesis that an unlawful secondary boycott could "not (be) made lawful by economic necessity", counsel next draws upon what he conceives to have been Congressional intent in the passage of Landrum-Griffin, commenting that "[t]his same argument was made when Congress was concerned with the enactment of the Labor-Management Reporting and Disclosure Act of 1959, particularly Section 8(e). The arguments made were that the enactment of Section 8(e) would make it unlawful to prohibit subcontracting to persons who maintain 'sweat shop' conditions. However *Congress stated* that the '*sweat shop' employer*, no less than any other *in present law is protected*' (2 Leg.Hist. '59, 1037; 1036(2) 1038(3))." (Italics supplied)

Unless words are without meaning the intent thus ascribed to Congress must be far wide of the mark, for in its preamble to the 1947 Taft-Hartley, it had declared as an objective consonant with national public policy the "encouraging [of] the practice and procedure of collective bar-

### Economic Remedies Lawfully Available to Union

It is not the Court's function to rewrite bargaining agreements,[11] nor

gaining * * * for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." (Act § 1; 29 U.S.C. § 151.)

Reference to the Congressional Record discloses that it was, indeed, not Congress that in any formal sense expressed a willingness in 1959 to have the sweatshop restored to its earlier unhallowed thrift. The words petitioner purports to quote as evidencing its intent were, in fact, spoken by Senator (now Vice President) Humphrey and spoken in opposition to an amendment proposed by Senator Goldwater to the pending Kennedy (the late President) bill which sought to amend Taft-Hartley in respects other than those involving the secondary boycott provisions of that law. (§ 8 (b) (4) Leg. Hist. Labor-Management Reporting and Disclosure Act of 1959, Vol. II, pp. 1035–1038, proceedings of Senate, April 17, 1959). It is historical fact that the bill ultimately enacted into law insofar as it dealt with this subject was largely the House (Landrum-Griffin) version with some modification agreed to by the House-Senate Conferees. The Kennedy or Kennedy-Ervin amendments were rejected.

Senator Humphrey was referring not to the effect of the bills under consideration, an implication petitioner makes in its memorandum, but to what he argued had been the force of the Taft-Hartley Law as construed by the Courts in relevant litigation since its enactment. The Senator, surely no enemy of labor, and, hence, arguing with the vehemence of a critical advocacy aspersed the statute by his charge that under it "[t]he sweatshop employer, no less than any other, in present law is protected." Continuing, he cited as his source for this extreme, and highly personal, conclusion the Taft-Hartley law, remarking (Leg.Hist. ibid. p. 1037–1) that "[w]hen Congress enacted Section 8(b) (4) it embraced the premise that no distinction can be drawn between 'good secondary boycotts and bad secondary boycotts' —volume 93 Congressional Record page 4198." The referent page of the Record reports floor colloquy and debate engaged in on April 29, 1947 in the Senate when Taft-Hartley was under consideration. The interlocutors were the late Senator Taft, chief sponsor of the

for that matter generally to suggest what may properly be sought for and, if agreed to, incorporated in such contract. For greater clarity in a later exposition measure, and Senator Pepper of Florida whose enthusiasm for its provisions was somewhat less than overpowering. It was in the course of the courteous, but, nevertheless, incisive interchange that Senator Taft made the observation (ibid. p. 4198–2) which Senator Humphrey recalled in 1959 that "it has been set forth that there are good secondary boycotts and bad secondary boycotts." Senator Taft had continued: "Our committee heard evidence for weeks and never succeeded in having anyone tell us any difference between different kinds of secondary boycotts. So we have so broadened the provision dealing with secondary boycotts as to make them an unfair labor practice."

Nowhere on the page of the 1947 Record to which Senator Humphrey referred in 1959 does it appear that either senator introduced the expression "sweatshop" into the text of his remarks or referred identifiably to its inhumane practices. Senator Taft, even if he had been so minded—and he was not—was too wise in the ways of the art he practised to so far compromise his public image as to advocate the recrudescence of that shoddy economic institution, and Senator Pepper was much too polite and too respectful of the integrity of the other to level at him so bitter an accusation as to his objective. The Ohio Senator's defense of this aspect of his bill occupies many columns of the record but is pithily encapsulated in the single sentence he uttered (ibid.—col. 3) that "There is no reason that I can see why we should make it lawful for persons to incite workers to strike when they are perfectly satisfied with their conditions." The concepts of "perfectly satisfied workers" and "sweatshop conditions" present an antilogy which surely could not have escaped the notice of the keen-minded senator from Ohio had he intended to equate the one with the other expression. To give him his due, he neither used the term "sweatshop" nor intended that his bill should water its thirsting roots.

That, indeed, has been the conclusion that the Courts have reached in a number of subsequent decisions of major dimension which are discussed in what follows immediately.

---

11. See note 11 on page 841.

of that which is impermissible, it is helpful preliminarily to survey those weapons which remain lawfully available in Labor's arsenal, Landrum-Griffin with its labor standards by the competition of what is here styled "owner-operators," and "gypsies." Nor has that Court failed to confirm the continuing legality of Labor's resort to traditional economic weapons in defense against such competition.

None of the three cases cited by the petitioner in its supplemental memorandum sustains the role assigned to them of demonstrating a Congressional intent to revitalize the sweatshop or of a judicial solicitude for its nourishment. The term is not to be found in the cases, nor do the Courts in these opinions make contextual reference to the subject, much less do they manifest a purpose or desire, absent express statutory compulsion, that Labor, undertaking its defense against so pitiless an economic foe as the sweatshop, shall be denied access to any of the avenues of persuasion and pressure traditionally open to it.

Two of these cases, Amalgamated Meat Cutters, etc. v. N. L. R. B., 99 U.S.App. D.C. 24, 237 F.2d 20 (1956), cert. denied 352 U.S. 1015, 77 S.Ct. 562, 1 L.Ed.2d 545, and Joliet Contractors Ass'n. v. N. L. R. B., 202 F.2d 606 (7th Cir. 1953), cert. denied 346 U.S. 824, 74 S.Ct. 40, 98 L.Ed. 349 were of pre-Landrum-Griffin vintage. The third, N. L. R. B. v. Amalgamated Lithographers of America, 309 F.2d 31 (9th Cir. 1962), cert. denied 372 U.S. 943, 83 S.Ct. 936, 9 L.Ed.2d 968, dealt with activities which in their inception surely preceded, but in their later development may well have overlapped, the effective date of Landrum-Griffin. (By Pub.L. 86–257 § 707 the amendments were to take effect sixty days after the date of enactment of the Act [Sept. 14, 1959]). The decisions in Amalgamated Lithographers and in Amalgamated Meat Cutters held illegal contract provisions, however phrased and irrespective of lawfulness of intent and implementation in other respects, which stipulated that a secondary employer unless he unionized was to be boycotted in his dealings with the primary employer, a party to the union contract. Maintenance of union conditions without the compulsion to enter into a union contract on the part of the secondary was not an issue in either case.

In the third, Joliet Contractors, the issue involved a union-induced naked boycott by the union employees of one employer of the other concern's prefabricated job destroying product.

The Supreme Court for its part when it has elected to speak on the subject has manifested no lack of vigor in describing the problems which confront unions, whose membership is engaged in the trucking industry, through the attrition of job opportunities and the erosion of

Milk Wagon Drivers' Union, etc. v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63, decided in 1940, which considered the problem in a pre-Taft-Hartley frame of reference was revisited in Local 24 of the International Teamsters v. Oliver, 358 U.S. 283, 294, 79 S.Ct. 297, 303, 3 L.Ed.2d 312 (1959). Oliver declared it unquestionably a proper labor objective "to protect the negotiated wage scale against the possible undermining through diminution of the owner's wages for driving which might result from a rental which did not cover his operating costs." An extensive analysis of these two last-mentioned cases is to be found, for which reason it is not here repeated, in this Court's unpublished memorandum in an earlier related case, McLeod, etc. v. Local 282, filed July 16, 1964, pp. 21–25 and footnotes. The Oliver case presented a pre-Landrum-Griffin application of the law. United States v. Drum, 368 U.S. 370, 82 S.Ct. 408, 7 L.Ed.2d 360, provided in 1962 a gloss on the Oliver case in a footnote (No. 26) which, attesting to the continuing i. e. post-Landrum-Griffin viability of Lake Valley, reads:

"Local 24 of Intern. Broth. of Teamsters, etc. v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312, did not, * * * hold that owner-operators are in any sense 'employees.' That case held that a bargaining unit including an overwhelming majority of concededly employed drivers of carrier-owned equipment was entitled, under § 8(d) of the National Labor Relations Act, 61 Stat. 142, 29 U.S.C. § 158(d), 29 U.S.C.A. § 158(d), to bargain to impasse concerning minimum rentals to be received by owner-drivers. It was not necessary to determine whether the owner-drivers were 'employees' protected by the Act, since the establishment of the minimum rental to them was integral to the establishment of a stable wage structure for clearly covered employee-drivers. See id., at 294–295, 79 S.Ct. at 303–304."

In Oliver the provision approved by the Court as protecting a legitimate objec-

purposive strictures upon the secondary boycott, notwithstanding.

Thus, the Local may, without violation, stipulate that no trucking of material may be subcontracted; it may require that all transportation from supplier to job site be effected in equipment operated by the regularly employed drivers of the materialman, and if by reason of insufficiency of vehicles, additional equipment is to be leased, that the leasing be of the vehicle alone, and not in a

tive of labor's bargaining and management's acceptance was "in express terms made applicable only to a lessor-driver when he himself drives his vehicle in the business of the lessee-carrier." In such circumstance "[h]is wages, hours and working conditions are then to be those applied to the carrier's drivers of carrier-owned vehicles * * *." The carrier was required to pay in respect of such owner-driver social security tax, compensation insurance, public liability and property damage insurance, etc. Most significantly, it was stipulated that the lessor-driver must be compensated by " 'separate checks * * * for driver's wages and equipment rental' " and "[t]he wage payment must be in the amount of 'the full wage rate and supplementary allowances' payable to carrier drivers similarly circumstanced who drive carrier-owned vehicles." Finally, equipment rental payment was required to be at not less then a minimum which would cover all costs before a profit.

To make clear the intent of this provision the parties declared that it was " 'to assure the payment of the Union scale of wages * * * and to prohibit [a carrier from] the making and carrying out of any plan, scheme or device to circumvent or defeat the payment of wage scales provided in this Agreement * * * or [making arrangements under which the driver] is required to accept less than the actual cost of the running of his equipment, thus, in fact, reducing his scale of pay.' "

Whether the owner-drivers were or were not to be deemed employees rather than independent contractors of the employer when he engaged their services does not appear to constitute the fulcral point on which the legality of the contract provision turns. So it would appear that Drum in its footnote and the Oliver cases hold. The petitioner here, however, has vacillated in its view as to what jural relationship subsists. Thus in the earlier case decided by this Court (see supra p. 21) the Board rejected the position there maintained by the charging parties that they were independent contractors. The Board, instead, bottomed its 10(l) proceeding upon a claim that the owner-operators were ad hoc employees of the employer whether materialman or purchaser of materials which in the transaction had been designated by the parties thereto as the one to be responsible for the transportation of the material from supplier to purchaser.

In the instant proceedings the Board has reversed its field, so to speak, and now accepts as valid the contention of the charging parties that they severally are employers either of others or of themselves, or of both others and themselves. The subject is dealt with at some length in this Court's earlier opinion (pp. 26–32) which analyzes extended excerpts from the opinion in Local No. 24, International Brotherhood of Teamsters, etc. v. N. L. R. B., 105 U.S.App. D.C. 271, 266 F.2d 675 (1959). In that case the Court of Appeals had found it possible to decide that no secondary boycott existed notwithstanding that that Court did not and could not with finality classify the owner-operators "by the application of * * * legalistic formulae as 'independent contractors', 'co-employers', or 'allies.' " For, the Court continued, "it is equally clear that there is a zone of dispute in which such formulae are useless, and the answer must be derived by applying the intent of the statute to the facts in the case. This is such a case. We need not devise a new word to describe the relationship here depicted."

See also Minnesota Milk Co. v. N. L. R. B., 314 F.2d 761 (8th Cir. 1963).

11. "Ordinarily, the rubric of not rewriting the contract for the parties does bear some relation to labor contracts. Every collective bargaining agreement is the resultant of opposing forces, representing their relative strengths and positions. To limit clauses won by one side, while leaving in effect the remainder of the contract. would upset the balance struck at the bargaining table." Truck Drivers Union Local No. 413, etc. v. N. L. R. B., 118 U.S.App.D.C. 149, 334 F.2d 539 (1964), cert. denied 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186, Nov. 1964. See also Employing Lithographers of Greater Miami v. N. L. R. B., 301 F.2d 20, 28 (5th Cir. 1962).

joint hiring of truck to cart and owner to drive at a lumped compensation.[12]

■ The Local may insist, moreover, that if trucking services are performed by others, union standards be maintained as to those who drive the trucks.[13] In implementation of such union standards provision the Local may properly bargain for an agreement that the hiring of a driver, even though he tenders, concomitantly with his services, a lease of a truck he owns be not upon a lumped compensation unallocated as between equipment and driver, but under an arrangement whereby wages in truck hire are paid for by separate checks, the wages at union scale, with welfare and other benefits, appropriately earmarked, remitted to the hirer as "employer", and the truck rental computed upon a realistic cost basis in a relevant market.[14]

Fairly claimable jobs may, moreover, be staked out and protected, and employment opportunities earlier lost may be recaptured.[15]

There are, however, no absolutes in this area of labor-management bargaining; only gradations in a spectrum ranging in polarity from the legal to the illegal.[16]

12. Minnesota Milk Co. v. N. L. R. B., supra fn. 10. See Meat and Highway Drivers, Dockmen, etc. v. N. L. R. B., 118 U.S.App.D.C. 287, 335 F.2d 709 (1964), at p. 716 for discussion of the employer's suffering "attrition or obsolescence of trucks, failure to buy or to lease new equipment, or the like" in its relation to permissible union activity intended "[t]o protect unit work by * * * deterring such employer conduct." See also fn. 10 supra.

13. The Board has from time to time held illegal a union standards subcontracting clause which stipulates that the subcontractor shall be one whose truckdrivers enjoy wages and benefits matching those required by the bargaining agreement.

The Board's basic reason for finding a subcontracting clause of such tenor illegal is the "view that a work standards clause accords 'the Union a veto over the decision as to who may receive the signatory employer's subcontracts' by defining 'the persons with whom the signatory employer may and may not do business.' This view, * * * follows the distinction that clauses which regulate 'who' may receive subcontracting work are secondary, while only clauses which regulate 'when' subcontracting occurs are primary." (Meat and Highway Drivers, Dockmen, etc. v. N. L. R. B., supra fn. 12.) The Court, however, in the opinion in that case "rejected that distinction [thus made by the Board] in a line of cases cited in the margin," (Retail Clerks Union Local 770 v. N. L. R. B., 111 U.S.App.D.C. 246, 296 F.2d 368 (1961); District No. 9, International Ass'n of Machinists v. N. L. R. B., 114 U.S.App.D.C. 287, 315 F.2d 33 (1962); Orange Belt District Council of Painters No. 48 v. N. L. R. B., C.A.D.C., 328 F.2d 534 (1964); Building and Construction Trades Council, etc. v. N. L. R. B., C.A.D.C., 328 F.2d 540 (1964); Truck Drivers Union Local No. 413 v. N. L. R. B., 334 F.2d 539, supra fn. 11; cf. Local 24 Internat'l Teamsters, etc. v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), explained, United States v. Drum, 368 U.S. 370, 382 fn. 26, 82 S.Ct. 408, 414, 7 L.Ed.2d 360) and "consider[ing] the matter once more * * * readopt[ed] the principles of these cases." The Court of Appeals thus declared the union standards provision protected primary activity. In the instant proceedings the Board appears still to maintain that such provision is illegal as stipulating for an unlawful secondary boycott. This Court feels itself constrained, however, to follow the contrary view of the judicial majority.

14. Local 24 Internat'l Teamsters, etc. v. Oliver, supra, fn. 13.

15. Meat and Highway Drivers, Dockmen, etc. v. N. L. R. B., supra fn. 12, 335 F.2d at p. 714. Ohio Valley Carpenters District Council, 136 N.L.R.B. 977, 984-986 (1962). Cf. Minnesota Milk Co. v. N. L. R. B., supra fn. 12.

16. "It may be that to force an employer to change his method of doing business with another would be to force him to cease doing business within the meaning of the clause we are now discussing, i. e.. clause (A) of Section 8(b) (4). Certainly, however, every change in method is not equivalent to a cessation. If it be held as a matter of law that a rearrangement of methods of doing business may possibly constitute a cessation of business within the meaning of this Section, each case must depend upon its own facts. Rearrangements or changes may be minor or major, or part way between

## Contract Provisions and Conduct Violative of Taft-Hartley and Landrum-Griffin

■ Clearly illegal as a union signatory requirement is Section 12 of the Ready-Mix contract in its demand that the employer in hiring additional equipment shall give "preference * * * to such equipment as is operated by Union men." For the same invalidity Section 6(c) of the Excavating Contract in stipulating that "outside trucks and equipment shall be hired from employers who have signed contracts with Local 282" etc. must be struck down.[17]

■ The threats of the Local addressed to the Concrete Companies of work stoppages unless they cease doing business with Negri and other persons not having plants or yards for the manufacture of concrete likewise violate the Act.[18] And when the threats are, as here, shown on occasion to have been made in the presence of the employees whose employer is coerced, the inducement and encouragement which the statutory provision interdicts has been demonstrated.[19] To the extent, moreover, that the respondent concrete companies, yielding to union duress or persuasion, join with the Local in an understanding, express, implied or merely de facto, to exclude from business dealings "persons" satisfying standards of ineligibility on other than lawful grounds, the actions of those respondents in this regard constitute an illegal secondary boycott which must be restrained.[20]

these extremes. A change may be so minor as not to affect the flow or nature of the business. On the other hand a change in method may be so drastic as to constitute, or necessarily cause, complete cessation of the business." Retail Clerks Union Local 770 v. N. L. R. B., 296 F.2d p. 372, supra fn. 13.

17. Meat and Highway Drivers, Dockmen, etc. v. N. L. R. B., supra fn. 12, 335 F. 2d at p. 717 reaffirms the proposition that a "provision [of a bargaining agreement] requiring or encouraging a boycott of cartage companies who do not have union contracts is a violation of § 8(e)," citing Building & Construction Trades Council v. N. L. R. B., supra fn. 13; Bakery Wagon Drivers & Salesman Local U. No. 484 v. N. L. R. B., 116 U.S.App.D.C. 87, 321 F.2d 353 (1963); District No. 9, International Ass'n of Machinists v. N. L. R. B., supra fn. 13; Retail Clerks Union Local 770 v. N. L. R. B., supra fn. 13. See also Truck Drivers Union Local No. 413, etc. v. N. L. R. B., supra fn. 11.

18. Sections 8(b) (4) (ii) (A and B).
N. L. R. B. v. United Ass'n of Journey. & App. of Plumbing, etc., 320 F.2d 250, 253 (1st Cir. 1963); N. L. R. B. v. Plumbers Union of Nassau County, Local 457, 299 F.2d 497 (2nd Cir. 1962); N. L. R. B. v. Highway Truckdrivers & Helpers, Local 107, 300 F.2d 317, 320 (3d Cir. 1962); N. L. R. B. v. Milk Wagon Drivers Union, Local 753, 335 F. 2d 326 (7th Cir. 1964). The attempted expulsion of the Negri type enterprise from the industry in which it operated for so long appears unmistakably to place the labor-management understanding which the banishment implemented, beyond the pale of that which is lawful as being "germane to the economic integrity of the principal [primary] work unit" and looks "to protect and preserve the work and standards [the union] has bargained for." Orange Belt District Council of Painters No. 48 v. N. L. R. B., supra fn. 13, 328 F.2d at p. 538; District No. 9, International Ass'n of Machinists v. N. L. R. B., supra fn. 13, 315 F.2d at p. 36.

19. Act § 8(b) (4) (i) (A and B).
International Brotherhood of Electrical Workers, Local 501 v. National Labor Rel. Bd., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).

20. Act, § 8(e). Los Angeles Mailers Union No. 9, Inter. Typo. U. v. N. L. R. B., 114 U.S.App.D.C. 72, 311 F.2d 121 (1962); District 9, International Ass'n of Machinists v. N. L. R. B., supra fn. 13. Cf. Meat and Highway Drivers, Dockmen, etc. v. N. L. R. B., supra, fn. 12, 335 F.2d at p. 716, reading:
"But a finding as to the object of one party to the contract is insufficient (standing alone) to support the conclusion that the contract itself violates § 8(e). Under § 8(e), what the Congress has prohibited are certain contract terms, and—as contrasted with § 8(b) (4)—the union's object is not an element of the unfair labor practice. To conclude that a contract term falling within the letter of § 8(e) properly falls within its prohibition, there

■ Finally, the threats of work stoppage made to Lizza, to compel its agreement—a pressure to which it yielded—to refuse to hire the lumped truck owner-driver services of Michalowski and Iocca, charging parties in the second of the above proceedings, were violative of the provisions of the Act[21] in that the thrust of the union's activity was directed at the neutral employer to boycott the owner-operator as a person not under contract with the local. Had the Local's approach to the problem been directed toward negotiation with its related employers of an agreement, bona fide, looking to conserve the job opportunities of its membership in such employment, it is not unlikely that provisions could have been formulated by the Local's representatives for inclusion in the bargained agreement, which, though inflicting an incidental harm upon the gypsy "independent contractors", would nevertheless, have been valid. As to whether the negotiations could have been carried through to a successful conclusion, however, the Court will not speculate, limiting itself to the observation that the continued survival of the gypsy in the industry may well constitute for the employers vis-a-vis the union a desirable "third force" in labor-management negotiations.[22]

### Excision of Illegal Provisions Not Feasible or Warranted—Duration of Restraint Directed

The Local's counsel proposes that "if the Court finds [subdivision (c) of Section 6 of the Excavating contract] an illegal union signatory clause, it should order only the violative language to be excised and should not enjoin implementation of the entire clause." This, the attorney suggests, could be achieved by directing that there be excised from the provision the restrictive language which limits potential lessors of equipment-cum-driver to a class of employers comprised of those who have *signed contracts with Local 282*. (Words underscored in original brief and here are those proposed by Local's counsel to be deleted from the clause.) The employers eligible for such subcontracting would, following the editing of the language of the clause as proposed, be found within an expanded classification of employers defined as those who maintained union standards, but without taking into account their union affiliation.

The Local urges upon the Court as persuasive precedent for such excision the procedure followed in Meat and Highway Drivers, Dockmen, etc. v. N. L. R. B., supra, fn. 12, wherein the Court wrote (335 F.2d p. 717) with respect to a similarly objectionable union signatory clause, as follows:

"* * * Excision of the objectionable language would give the employers greater latitude under the contract. Thus excision should be acceptable to them. And the union, certainly, would rather see the language deleted than lose the benefit of the remainder of the clause. Deletion, then, would leave the total collective bargaining agreement in a state close to the actual agreement of the parties. And deletion would satisfy totally the requirements of § 8(e). Accordingly, we hold that the Board should not invalidate more

---

must be either a finding that both parties understood and acquiesced in a secondary object for the term, or a finding that secondary consequences within § 8(e)'s intendment would probably flow from the clause, in view of the economic history and circumstances of the industry, the locality, and the parties."

21. See cases cited under fn. 18 supra. Cf. Orange Belt District Council of Painters No. 48 v. N. L. R. B., supra fn. 13, 328 F.2d p. 538, at which point

the opinion comments that "[t]he key question presented by subcontracting clauses in union agrements with general contractors is whether they are addressed to the labor relations of the subcontractor, rather than the general contractor. If so, they are secondary as to the general contractor and may not be enforced against him through economic weapons."

22. See Court's opinion in earlier proceeding, pp. 32 and 33.

of the contract than is unlawful, 'where the excess may be severed and separately condemned as it can here.' National Labor Relations Board v. Rockaway News Co., 345 U.S. 71, 79, 73 S.Ct. 519, 524, 97 L. Ed. 832 (1953)."[23]

This Court feels, however, that the situation it here confronts neither permits of, nor warrants, such remedial surgery. We do not now deal with a narrowly limited contract provision, but rather with a conflation of what is illegal in the bargaining agreement itself and subsequent oral understandings and conduct likewise illegal or at the least highly suspect. We are left in uncertainty as to what the current understanding between the parties may be and as to what considerations moving from the one contracting party to the other constituted payment for reciprocated concessions and benefits.

The situation is one wherein excision treads too closely on the heels of redrafting, a procedure in which the Court may not engage. (See fn. 11, supra). The scope and complexity of the activities violative of the Act are such, and are so implicated with those which might have been lawful, were the latter more sharply delineated and restricted, that the Court feels constrained to issue an interim order enjoining activity generally as prayed for, but with the limitations hereinafter noted.

It is proper that an immediate cessation of illegal activities be directed and a reasonable interval established for the untoward effects of those activities to subside. That interval will be additionally useful to the respondent parties, should they be so minded, for bargaining anew in an effort to devise ingenious remedies for the troubles, hereinbefore noted, which beset their industry, without their invading the statutorily secured right of the owner-operator and the plantless trucker to be free of secondary boycotts directed at them.

When what is now held illegal may thus be rendered conformable to law by effective bargaining and when much that is permissible must be currently restrained because of the confusion of the valid with what is inhibited, it would be unreasonable for the Court to impose a restraint for a duration limited only by the period, however long, which must elapse before the Board shall have made its determination of the issues. The burdens of the Board are notoriously heavy, and its processes in consequence are slow. But the respondents if ultimately successful to any extent would gain an empty victory if success were to come to them only after irremediable damage has been suffered through delay.

### Relief Granted

Injunctions shall, accordingly, issue in each proceeding of the scope noted below, pending the final disposition of the relevant proceedings before the petitioner N.L.R.B., but if such final disposition shall not have been made on or before April 1st, 1965, the injunction shall expire on such date. Leave, however, is granted to petitioner to move for an extension of the injunction by motion returnable before such expiration date.[24] The Court has not here found illegal the language in Section 12 of the Ready-Mix contract and in Section 6 of the Excavating contract insofar as it stipulates that additional equipment may be hired by an employer under contract only after all its available equipment is being used by its own employees. The finding of illegal-

---

23. See also Truck Drivers Union Local No. 413, etc. v. N. L. R. B., supra fn. 11, 118 U.S.App.D.C. 149, 334 F.2d at pp. 549, 550, and footnote 17 appended 334 F.2d at page 550.

24. United Brotherhood of Carpenters, etc. v. Sperry, 170 F.2d 863 (10th Cir. 1948); McLeod v. Local 239, Internat'l Bro. of Teamsters, etc., 182 F.Supp. 949 (E.D. N.Y.1960); Alpert v. International Brotherhood of Elec. Wkrs, 163 F.Supp. 774 (D.Conn.1958); Getreu v. International Typographical Union, 205 F.Supp. 931 (S.D.Ohio 1962); cf. Dooley v. Highway Truckdrivers & Helpers, etc., 190 F.Supp. 112 (D.Del.1960), 192 F.Supp. 198 (D.Del.1961).

ity is limited to a determination that the language purporting to define the class of those who may be engaged for such excess trucking as being comprised only of union people, whether under union contract or holding union membership, is illegal as stipulating a union-signatory requirement, and a further finding is made that the legal portions of the provisions affected may not be severed and validated through excision of that which is illegal. The respondent Local, on the other hand, is not restrained from bargaining with its contract-employers and others for provisions embodying that which is thus held lawful, nor from exercising its traditional rights in bringing those negotiations to fruition.

■ The injunction orders shall contain the directions applied for by petitioner, limited in scope as indicated, and applicable to the facts herein found in respect of the issues tendered.[25]

Settle separate orders in each proceeding on notice.

---

25. The prayers of the petitions parallel in their wide sweep the language of §§ 8(b) (4) and 8(e). If granted, the Court will have enjoined the union, under a literal reading of its orders, from bringing otherwise lawful economic pressure to bear upon its employers to enter into contracts with labor objectives sanctioned by law and precedent. Such permissible objectives include provisions which bar subcontracting altogether, or, if subcontracting be permitted, which require the subcontractors to maintain union standards. Additional lawful provisions might be incorporated which seek to preserve existing job opportunities and restore those earlier lost, or which restrict the hiring of equipment, or which when employer-owned equipment is insufficient for the employers' full needs, permit the employer to lease equipment, but bar it from engaging the services of the owner as driver. It is lawful, indeed, for the union in a proper context to seek agreement that all trucking of a materialman's product from plant to job site where it is to be consumed be performed by the direct employees of the supplier.

Manifestly, if any or all of these union demands were conceded to the Local by the suppliers, and effectively implemented, the incidental impact upon the charging parties before this Court and others similarly circumstanced would be no less than that of the consenual boycott complained of here, yet with the objective of the union lawful and directed against a primary employer of its members, the reasonable consequences of the attainment of such objective by the union would, nevertheless, have to be endured by the secondaries affected. United Steelworkers of America v. N. L. R. B., 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964). "Thus" [the opinion of the Court of Appeals, in Meat and Highway Drivers, Dockmen, etc. v. N. L. R. B., supra fn. 12 reads 335 F. 2d p. 713] "the 'cease doing business' langauge in § 8(e) cannot be read literally because inherent in all subcontracting clauses, even those admittedly primary, is refusal to deal with at least some contractors."

The footnote appended to the foregoing quotation serves as further admonition to this Court to limit in the respects noted the scope of the injunctive relief granted. The Local and the employers with whom it has 'or enters into relations are not to be precluded from bargaining to an agreement within the framework of what is here held lawful, nor from carrying out the terms of such agreement though incidental harm be inflicted on neutrals.

The Meat and Highway Drivers footnote follows:

" '* * * [L]iteralism is not the touchstone for construction of section 8(e). The question rather is whether a particular agreement is fairly within the intendment of Congress to do away with the secondary boycott.' District No. 9, International Ass'n of Machinists v. N. L. R. B., supra Note 8, 114 U.S.App.D.C. at 290, 315 F.2d at 36.

"In § 8(e), as has been said in regard to § 8(b) (4) (B), the phrase 'cease doing business with any other person, must be read with the implicit condition that * * * [it] be accomplished by secondary, but not primary means. Within the area of primary conduct a union may lawfully persuade all persons * * * to cease doing business with the struck employer.' Schultz Refrigerated Service, Inc., 87 N.L.R.B. 502, 504 (1949); see also Local 761, International Union of Electrical, Radio and Machine Workers v. Labor Board, supra Note 12, 366 U.S. [667] at 672, 81 S.Ct. [1285] 1288 [6 L.Ed.2d 592]."